**Randolph R. GILLUM, D.O., Appellant,**

v.

**REPUBLIC HEALTH CORP. d/b/a Mesquite Physicians' Hospital, et al., Appellees.**

**No. 05-88-01267-CV.**

Court of Appeals of Texas, Dallas.

Sept. 11, 1989.

Todd E. Marshall, Dallas, Edward A. McConwell, Overland Park, Kan., for appellant.

Charles W. Cunningham, Jennifer R. Brandeis, Dallas, for appellees.

Before WHITHAM, LAGARDE and KINKEADE, JJ.

1. The record reflects that Le Roy A. Pesch is sometimes referred to as "Leroy" or "LeRoy."

2. The record reflects that Michael E. DeBakey is sometimes referred to as "Debakey" or "De Bakey."

OPINION

LAGARDE, Justice.

Randolph R. Gillum, D.O., appeals from a summary judgment in favor of the Republic Health Corporation of Mesquite d/b/a Mesquite Physician's Hospital (MPH) and Republic Health Corporation (the hospital) (collectively referred to as "Republic"), James McAtee, James E. Buncher, James Van Devender, Le Roy[1] A. Pesch, Michael E. DeBakey,[2] and David T. Vandewater (collectively referred to as appellees). In seven points of error, Gillum contends that the trial court erred in granting summary judgment in favor of appellees. We disagree and, accordingly, affirm the trial court's judgment.

Gillum, a doctor of osteopathic medicine with a specialty of surgery, had been involved in the practice of medicine for over twenty-five years at MPH. In addition, Gillum was a cofounder of the MPH and was a party to the sale of the MPH in 1978 to a nonprofit corporation established by the City of Mesquite, Texas. On or about November 30, 1984, through the nonprofit corporation, the City of Mesquite caused MPH, to be sold[3] to Republic. Subsequent to the sale of MPH, Gillum and Republic had a series of disagreements regarding the organization and administration of the hospital and the service provided to the patients.

In his third amended petition, Gillum asserted that Republic owed Gillum a duty to maintain a level of care to Gillum's patients equal to or greater than that of the community. Gillum alleged that this duty arose from a fiduciary relationship existing between Gillum and Republic. In addition, Gillum alleged causes of action against Republic based on breach of a fiduciary duty, negligence in performing its duty, breach of express and implied contract, fraud, defamation, and tortious interference with contracts of Gillum. Gillum also set forth

3. Republic asserts that MPH was purchased with the consent and approval of the City of Mesquite.

allegations of individual liability against McAtee, Buncher, Devender, Pesch, DeBakey, and Vandewater, as officers and members of the board of directors of Republic.

■ On October 20, 1987, Republic filed a motion for summary judgment. The trial court held that the causes of action set forth by Gillum were insufficient as a matter of law to form the basis of an action against Republic and entered a take-nothing judgment on May 6, 1988 (the summary judgment). Because Gillum believed liability of the remaining appellees was dependent upon the same underlying issues raised by the evidence submitted in support of, and in opposition to, the summary judgment entered in favor of Republic, all parties to the suit agreed that a final judgment "be entered in order that litigation can become final for the purposes of appeal." Judgment was rendered on September 22, 1988 (the final judgment).

Appellees contend that because Gillum not only drafted the final judgment, but also "approved [the judgment] as to form and substance," Gillum is now foreclosed from contesting the judgment as to all of the appellees. In response, Gillum argues that the agreement regarding the final judgment was, in fact, a contract, and appellees should be required to abide by the contract as expressed in the final judgment and allow Gillum to appeal the judgment rendered in favor of the appellees. *See generally Wagner v. Warnasch,* 156 Tex. 334, 295 S.W.2d 890 (Tex.1956). Thus, Gillum maintains that appellees should be sanctioned if they fail to abide by the contract.

It is a well settled principle of law that a party cannot appeal from or attack a judgment to which he has consented or agreed absent an allegation and proof of fraud, collusion, or misrepresentation. *See Hosey v. First Nat'l Bank,* 595 S.W.2d 629, 630 (Tex.Civ.App.—Corpus Christi 1980, writ dism'd), *citing Dunman v. Hartwell,* 9 Tex. 495 (Tex.1853). The rationale of such a rule is that a party will not be allowed to complain on appeal of an action or ruling which he invited or induced. Having consented to this action of the court in enter-ing judgment, he thereby waives all errors committed or contained in the judgment, thus having nothing which could properly be considered by an appellate court, except want of jurisdiction. *DeLee v. Allied Finance Co.,* 408 S.W.2d 245, 247 (Tex.Civ. App.—Dallas 1966, no writ), *citing Posey v. Plains Pipe Line Co.,* 39 S.W.2d 1100, 1100–01 (Tex.Civ.App.—Amarillo 1931, no writ).

■ Gillum is correct when he states that a consent judgment is contractual. When a consent judgment imposes duties or obligations on the parties, and where a party fails to fully comply with the obligations of the judgment, the other party may seek to enforce the contractual obligations. *See generally Wagner,* 295 S.W.2d at 891–893. However, the contractual obligation Gillum now seeks to enforce is an agreement to appeal, or attack, the judgment, and the rule precluding a party from appealing from an agreed judgment applies regardless of whether the language contained in the agreed judgment purports to preserve any errors or a right to appeal. *See Posey,* 39 S.W.2d at 1100; *see also Braden v. State,* 108 S.W.2d 314, 316 (Tex. Civ.App.—Waco 1937, no writ); *Pair v. Buckholt,* 60 S.W.2d 463, 464 (Tex.Civ.App. —Amarillo 1933, no writ).

In *Posey,* a consent judgment was entered in favor of the defendant. Although the judgment clearly recited that the consent judgment was "subject to the right of the plaintiff to except thereto and question its validity," the appellate court held that the plaintiff had waived all errors. That court, citing the general rule that a party cannot appeal from a judgment rendered by consent or agreement, concluded that the mere fact that the parties agreed, and the trial court decreed, that an appellate court could review the alleged errors was "in no degree binding" on the appellate court. *Id.* at 1101. Thus, we conclude that the parties' agreement to enter judgment in favor of the appellees "in order that litigation can become final for purposes of appeal" is not binding on this Court, and consequently, we hold that Gillum cannot appeal the final judgment rendered in favor

of the individual appellees. Disagreeing with appellees that the agreed judgment prohibits Gillum from appealing the final judgment as to all of the appellees, including Republic, we hold that Gillum is precluded from attacking the final judgment as to the individual appellees, but not as to Republic. We hold that Republic's liability was determined by the summary judgment, not by the final agreed judgment. Thus, we grant appellees' motion to dismiss the appeal as to the individuals, McAtee, Buncher, Van Devender, Pesch, DeBakey, and Vandewater, and deny their motion to dismiss the appeal as to Republic.

We now return to the merits of Gillum's appeal. The standards for reviewing a summary judgment are:

1.  The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

2.  In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be taken as true.

3.  Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.

*Hartsough v. Steinberg,* 737 S.W.2d 408, 410 (Tex.App.—Dallas 1987, writ denied), *quoting Nixon v. Mr. Property Management,* 690 S.W.2d 546, 548–49 (Tex.1985). The function of a summary judgment is not to deprive a litigant of his right to a full hearing on the merits of any real issue of fact, but to eliminate patently unmeritorious claims and untenable defenses. *Hartsough,* 737 S.W.2d at 409, *citing Gulbenkian v. Penn,* 151 Tex. 412, 416, 252 S.W.2d 929, 931 (1952).

Defendants who move for summary judgment have the burden of showing the trial court as a matter of law that no material issue of fact exists as to the plaintiff's cause of action. *Griffin v. Rowden,* 654 S.W.2d 435–36 (Tex.1983). This may be accomplished by summary judgment evidence showing that at least one of the elements of the plaintiff's cause of action

has been established conclusively against the plaintiff. *See Sakowitz, Inc. v. Steck,* 669 S.W.2d 105, 108 (Tex.1984). With this standard in mind, we turn to the issues and the summary judgment proof in the present case.

## TORTIOUS INTERFERENCE OF A BUSINESS RELATIONSHIP

In his first point of error, Gillum contends that the trial court erred, as a matter of law, in finding that no issue of material fact existed regarding tortious interference of existing and prospective contracts. Gillum maintains that Texas law protects three types of business relationships from tortious interference: (1) contractual relationships; (2) at-will contracts; and (3) prospective business relationships. Gillum argues that he and Republic had an ongoing relationship whereby Gillum performed all of his surgeries at the hospital, thereby generating revenue for Republic; the hospital would, in turn, provide adequate medical care of at least the community standard.

Gillum asserts that after Republic acquired MPH the level of care dropped almost immediately. He asserts that he lost fifty-six patient referrals, upon whom he would have performed surgery, if Republic had maintained the level of health care at the hospital equal to or greater than that of other hospitals in the community. Gillum cites examples evidencing the decline in health care at the hospital:

(1) the hospital nursing staff had been frequently overworked and undertrained;

(2) the hiring and firing policies of the hospital were discriminatory and arbitrary and were calculated to reduce overhead rather than provide adequate care and services, and competent personnel had been wrongfully discharged and replaced by inexperienced and improperly trained personnel;

(3) the hospital had not been provided with an adequate budget to assure adequate care;

(4) critical nursing stations were frequently understaffed and unstaffed for extended periods;

(5) nurses frequently failed to follow doctors' orders;

(6) the hospital failed to provide services normally provided to patients and staff doctors by Dallas metropolitan community hospitals;

(7) hospital administration officials continuously ignored requests of staff doctors concerning the improvement of health care and services at the hospital;

(8) staff doctors, including Gillum, were threatened with retribution if they persisted in their complaints about the health care provided to patients at the hospital;

(9) competent emergency room staff doctors were arbitrarily discharged from the hospital and replaced with doctors untrained or unoriented regarding proper hospital procedures;

(10) the main surgical desk had no clerk or nurse who was assigned to continuously answer the phone and take orders, answer patient lights, or provide continuity required at a surgical nurses' station to handle care for post-surgical patients and/or emergencies;

(11) patients were not ambulated as per doctors' orders;

(12) medicine frequently was not given as per doctors' orders;

(13) there was an inadequate number of nurses to care for patients and carry out doctors' orders;

(14) bandages were not changed as per doctors' orders;

(15) nurses were not properly oriented concerning the hospital's procedures and personnel;

(16) nursing crews in surgery were not oriented and trained concerning materials, instruments, procedures, personnel, and sterile techniques;

(17) iv's were not monitored properly and were left plugged in while not running and/or were empty for excessive periods of time;

(18) doctors were not timely notified of patient problems and/or complications;

(19) abdominal binders were put on upside down and backwards;

(20) heating pads had been left on patients' abdomens without water circulating through the pads;

(21) the director of nursing instructed nurses not to call after hours;

(22) many patients complained of the hospital being dirty and having poor food;

(23) records maintained by the hospital personnel in surgery were inaccurate concerning the operation and surgical log;

(24) communications with the surgery charge nurse were often so poor that it caused unnecessary trips to the hospital by staff doctors;

(25) a consistent lack of nurses, inadequate nursing care, and the lack of a surgery desk clerk caused many unnecessary trips to the hospital by doctors to care for patients, and doctors had to ambulate their own patients;

(26) numerous nurses who speak poor English frequently were unable to communicate with doctors during emergency or urgent situations;

(27) emergency room doctors were not adequately oriented and/or indoctrinated concerning the facility, consulting specialists, staff doctors, and proper procedures;

(28) frequently, nurses were responsible for procedures that they were not trained to do, i.e., caesarean sections where first time scrub nurses did not know the names of instruments;

(29) the hospital administrator was not available after 5:00 p.m. to doctors or nursing staff;

(30) patients frequently were not instructed on how to care for themselves postoperatively;

(31) frequently, the original medical records tape of doctors was lost and it had to be redictated;

(32) many promises to have a desk clerk and adequate nurses were not fulfilled;

(33) minutes of the hospital's meetings were inaccurate or altered by the hospital administrator to delete important issues that were discussed;

(34) nurses provided false information to doctors about patient status and patient care and failed to notify doctors of a patient's serious symptoms that might cause harm to the patient;

(35) nurses made false entries on the nurses' notes in order to reflect patient care that was not, in fact, provided; and

(36) nurses had, with the knowledge of the director of nurses, altered hospital records in an attempt to cover up negligent and deficient patient care.

Gillum maintains that he had performed over 8,000 surgeries at the hospital and would have continued to perform surgeries there had the level of health care not become so low. Further, Gillum asserts that based upon the hospital's substandard level of care, doctors who had previously made referrals of patients to Gillum refused to do so any longer. Therefore, Gillum contends that but for the hospital's substandard level of care, he would have received future patient contracts.

It is axiomatic that recovery under any theory of tort, including tortious interference with contractual relations, must be predicated upon the breach of a positive duty imposed by law. *Rodriguez v. Dipp,* 546 S.W.2d 655, 658 (Tex.Civ.App.—El Paso 1977, writ ref'd n.r.e.). Thus, for Gillum to prevail on his cause of action for tortious interference with a business relationship, the hospital must owe a separate legal duty to Gillum requiring the hospital to provide adequate medical care to hospital patients.

■ In Texas, although a duty exists between a hospital and its patients to provide them with a certain level of medical care, the breach of which duty results in liability on the hospital, *see Harris v. Harris County Hosp. Dist.,* 557 S.W.2d 353, 355 (Tex.Civ.App.—Houston [1st Dist.] 1977, no writ), Gillum and Republic concede that Texas has not yet recognized that a hospital owes a separate duty to physicians to provide adequate medical care to patients, and we decline to recognize such a cause of action.

■ Moreover, in order to sustain a cause of action for tortious interference with a contract, there must be a valid, existing contract subject to interference. *See Steinmetz & Assocs., Inc. v. Crow,* 700 S.W.2d 276, 277 n. 1 (Tex.Civ.App.—San Antonio 1985, writ ref'd n.r.e.); *O'Connor v. Glitsh Eng'g & Sales Corp.,* 589 S.W.2d 808, 809 (Tex.App.—Dallas 1979, no writ). Although Gillum contends that he had an at-will employment contract with Republic, the evidence before the trial court revealed that the only contractual relations arguably subject to interference were patient referrals of a prospective nature. There was no evidence that appellees had interfered with any existing contracts of Gillum except insofar as Gillum was granted the privilege of practicing at the hospital, and Gillum does not contend that his staff privileges were revoked. Consequently, because the summary judgment evidence conclusively negated the existence of any contracts subject to interference, we conclude that at least one of the elements of Gillum's cause of action for tortious interference of a contractual relationship or with an at-will contract between Republic and him was established conclusively against him.[4] *See Sakowitz,* 669 S.W.2d at 108. Consequently, we further conclude that summary judgment on that claim in favor of Republic was proper.

■ With regard to Gillum's claim for tortious interference with prospective contractual relations, we further conclude that the trial court properly granted summary judgment. In order to assert a claim for tortious interference with prospective contractual relations, the burden rests upon the plaintiff to establish that: (1) there was a "reasonable probability" of entering into a contractual relationship; (2) the defendant acted maliciously by intentionally preventing the relationship from occurring with the purpose of harming the plaintiff; (3) the defendant was not privileged or justified; and (4) actual harm or damage occurred as a result. *Leonard Duck-*

---

**4.** Gillum concedes that the elements for tortious interference of an at-will contract are the same as for tortious interference with a contractual relationship.

*worth, Inc. v. Michael L. Field & Co.*, 516 F.2d 952, 956 (5th Cir.1975) (applying Texas law); *see also Levine v. First Nat'l Bank*, 706 S.W.2d 749, 751 (Tex.App.—San Antonio 1986), *rev'd on other grounds*, 721 S.W.2d 287 (1986).

■■■ We conclude that the hospital's action was privileged. In Texas, a party cannot recover for tortious interference if the interference was privileged. Texas courts have consistently held that:

> one is privileged to interfere with a contract between others when he does so in the bona fide exercise of his own rights or when he possesses an equal or superior interest to that of the plaintiff in the subject matter.

*Sakowitz*, 669 S.W.2d at 107.

The evidence before the trial court was undisputed that Republic owned the hospital and had the right to operate the hospital and to control its policies, practices, and procedures. As the owner of the hospital, Republic clearly had a superior financial interest in (1) the manner in which the hospital was ultimately operated and (2) the manner in which the hospital performed its contractual obligations with its patients. Any interference which may have occurred was thus the result of the bona fide exercise of Republic's rights. Accordingly, we conclude that, as a matter of law, if in fact Republic's action resulted in tortious interference with Gillum's prospective contractual relations, it was privileged. This is also true of Gillum's claim of tortious interference with an existing contract and an at-will employment contract. *See Sakowitz*, 669 S.W.2d at 107; *Black Lake Pipe Line Co. v. Union Constr. Co.*, 538 S.W.2d 80, 91 (Tex.1976). Gillum's first point of error is overruled.

## FIDUCIARY RELATIONSHIP

In his second point of error, Gillum contends that the trial court erred, as a matter of law, in finding no issue of material fact regarding the existence of a fiduciary relationship between Gillum and Republic. Gillum asserts that a fiduciary relationship exists when:

> [T]he parties are under a duty to act for or give advice for the benefit of another upon matters within the scope of the relation. It exists where a special confidence is reposed in another who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.

*Fisher v. Roper*, 727 S.W.2d 78, 81 (Tex. App.—San Antonio 1987, writ ref'd n.r.e.), *citing Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 502, 507 (Tex.1980). Gillum further asserts that the definition of a fiduciary relationship also includes informal relationships such as moral, social, domestic, or purely personal relationships which are created by one party placing implicit trust and reliance on another. *See Tuttlebee v. Tuttlebee*, 702 S.W.2d 253, 256 (Tex.App.— Corpus Christi 1985, no writ).

Gillum maintains that a fiduciary relationship existed between Republic and him because the relationship developed over a long period of time and they worked together toward a mutual goal. *See O'Shea v. Coronado Transmission Co.*, 656 S.W.2d 557, 563 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.), *citing Consolidated Gas & Equipment Co. v. Thompson*, 405 S.W.2d 333, 336–37 (Tex.1966). Gillum states that the longstanding relationship between MPH and him is evidenced by the fact that he was a cofounder of MPH (formerly Rutherford General Hospital and Mesquite General Hospital) in the early 1960's and that he did not cease the business relationship with Republic until November 1986; that when Republic purchased MPH, Republic thereby accepted the responsibility which MPH previously had toward Gillum, *i.e.*, providing adequate care for Gillum's patients; and that Republic, through its representatives, acknowledged its responsibilities to Gillum even through the time Gillum resigned from the hospital staff.

Gillum contends that he also met the second criterion in determining whether an "informal" fiduciary relationship exists; that is, whether there was a mutual goal between Republic and him. Gillum argues that the relationship between a doctor and a hospital is to work together as a team to

improve the health of patients in that each party relies on the other to fulfill its responsibilities and each must have confidence in the other's fulfillment of its obligations; the doctor has the obligation to perform surgery or prescribe treatment or medication for the patient which will best enable the patient to regain his or her health; the hospital accepts the responsibility of providing the patient with proper care and accepts a duty to exercise that degree of care, skill, and diligence used by hospitals generally in the community; a surgeon works with hospital personnel from the time prior to the performance of the operation on the patient until the time the patient leaves the hospital facility; the hospital has the responsibility of preparing the patient for the operation and ensuring that the operating room and instruments are sterile so as to prevent infection of the patient following the operation; the hospital assists the surgeon throughout the operation by providing the instruments for the surgeon as requested and monitoring the patient throughout the operation; following the operation, the hospital monitors the patient's recovery and treatment as prescribed by the doctor; and the hospital provides medication and care to the patient as per doctor's orders. Referring us to the thirty-six examples listed in his first point, Gillum asserts that Republic breached its fiduciary duty to him. Gillum also maintains that Republic breached its fiduciary duty by failing to keep promises that it made to him regarding making additions and updates to the hospital facilities and services and overall improvements in the general care of patients admitted to the hospital.

Although we agree with Gillum's recitation of law regarding the definition of a fiduciary duty, we conclude that no fiduciary duty existed in this instance. A fiduciary duty is an extraordinary one and will not lightly be created. The mere fact that one subjectively trusted the other does not, alone, indicate that he reposed confidence in the other in the sense demanded by fiduciary relations, because something apart from the transaction itself is necessary. *Chien v. Chen*, 759 S.W.2d 484, 494 n. 6 (Tex.App.—Austin 1988, no writ), *citing Consolidated Gas*, 405 S.W.2d at 336. Although a fiduciary duty may be imposed on relations outside the traditional ones, the exact same requirements necessary to establish a traditional fiduciary relation must be met to establish an informal fiduciary relation. *See generally Moore*, 595 S.W.2d at 507; *Chien*, 759 S.W.2d at 494; *Page Airways, Inc. v. Associated Radio Serv. Co.*, 545 S.W.2d 184, 192–93 (Tex. Civ.App.—San Antonio 1976, writ ref'd n.r. e.).

In the case at bar, the summary judgment evidence refuted Gillum's contention that he and Republic were fiduciaries. The evidence showed merely that Gillum, like all doctors at the hospital, had staff privileges at the hospital; as a matter of law, the existence of staff privileges, and the accompanying "trust" the doctor has that his orders will be carried out, is insufficient to create a fiduciary duty. Indeed, the only evidence before the trial court was Gillum's self-serving statement that he "relied explicitly on [hospital] staff and personnel to complete [his] order and enable [his] patients to recover their health." [5] Gillum did not allege, nor was there evidence to suggest, that Gillum had reposed a special confidence in the hospital and was thereafter guided by the advice and judgment of the hospital staff—a key element in establishing any fiduciary relation.

Even though the existence of a confidential relationship is a question of fact, *see Page Airways*, 545 S.W.2d at 192, at most, Gillum merely alleged his subjective trust in the hospital which, in and of itself, was, as a matter of law, insufficient to create a legal duty. *See Consolidated Gas*, 405 S.W.2d at 336; *Chien*, 759 S.W.2d at 494.

Additionally, even if there were evidence that Gillum had reposed a special confidence in the hospital, Gillum still failed to

---

**5.** Although Gillum's third amended petition alleged that the hospital was his agent, the summary judgment evidence eliminated a finding of a principal-agent relationship between Gillum and the hospital as a basis for the imposition of a fiduciary duty.

assert a basis for the imposition of a fiduciary duty. First, under the basic definition of a fiduciary, the one with whom the special confidence is reposed is obligated to act in good faith toward the very one reposing the confidence. *Fisher*, 727 S.W.2d at 81. In the instant case, Gillum admitted that the hospital was obligated to act in good faith toward the *patients*, not him. Thus, no tenable basis for the imposition of a fiduciary duty existed.

■ Second, the summary judgment evidence negated a finding that Gillum and Republic had a longstanding relation that could justify the imposition of a fiduciary relation and corresponding duty. The evidence was undisputed that prior to November 1984, Gillum had no relationship with Republic. Gillum cannot "bootstrap" his previous association with two separate entities—Rutherford General Hospital and Mesquite General Hospital—as a basis for asserting a "26 year relationship" with Republic. Thus, we conclude that a fiduciary relationship did not exist between Gillum and Republic. Gillum's second point of error is overruled.

### BREACH OF EXPRESS CONTRACT

■ In his third point of error, Gillum contends that the trial court erred, as a matter of law, in finding that Republic did not breach its express contract with him. Gillum maintains that there was an express contract between Republic and him that consisted of Gillum admitting his patients to the hospital and performing surgeries in consideration of the hospital providing health care for Gillum's patients at a level equal to or greater than that of other hospitals within the community. Gillum argues that the contract was initially entered into between Gillum and MPH when Mesquite Medical Facilities Corporation purchased MPH in 1978 and leased it to Rutherford General Hospital. He further maintains that when Republic purchased the hospital in November 1984, Republic assumed all actual and implied contracts that had previously existed between Gillum and MPH. Gillum asserts that he continued to rely upon the repeated assurances regarding the quality of patient care by continuing to practice at the hospital and continuing to place patients in the care of the hospital's staff and personnel. Gillum further asserts that even if his contract with Republic was terminable at will, Republic was required to terminate his contract. However, because Republic continued to renew Gillum's staff privileges at the hospital, Gillum contends that Republic did not terminate his contract. Thus, Gillum asserts that Republic cannot be released from its liability for breach of the contract; and he further maintains that he reasonably relied on the promises and assurances of Republic and that he now has a right to relief based upon the theory of promissory estoppel.

We conclude that the trial court properly entered summary judgment against Gillum on his breach of contract claim because the evidence established, as a matter of law, that no contract existed. The summary judgment evidence submitted by Republic affirmatively stated that they had never entered into any contracts, written or oral, with Gillum. In response, Gillum asserted that he had an express contract with Republic pursuant to which Gillum would admit patients into the hospital, and the hospital would provide medical care equal to or greater than the community standards.

The law is well settled that a contract, to be enforceable, must be sufficiently certain so as to enable the court to determine the respective legal obligations of the parties. *See Bendalin v. Delgado*, 406 S.W.2d 897, 899 (Tex.1966); *Weitzman v. Steinberg*, 638 S.W.2d 171, 175 (Tex.App.—Dallas 1982, no writ). In the present case, Gillum alleges that the oral contract consisted of terms such as Republic's "commitment to upgrade the [hospital's] facilities and health care"; "Republic had a commitment to make the level of patient care rise"; and Republic had a "commitment to build a new addition to the [hospital] facility." Those "terms" are too indefinite, as a matter of law, to create any contractual obligation. The evidence was undisputed that no enforceable contract existed between Gillum and Republic. *See Bendalin*, 406 S.W.2d

at 899. Moreover, the summary judgment evidence negated the contention that any contract was entered into between Gillum and Republic to upgrade the hospital and level of patient care and to build a new addition to the hospital. In addition, while Gillum alleged that he had a contract with the previous owners of the hospital that was merely assumed by Republic when it purchased the hospital, there was no summary judgment evidence of that alleged assumption.

For the foregoing reasons, we hold that the trial court properly held that Gillum's claim for breach of express contract was insufficient as a matter of law. Gillum's third point of error is overruled.

## BREACH OF IMPLIED CONTRACT

■ In his fourth point of error, Gillum contends that the trial court erred, as a matter of law, in finding that there was no issue of material fact as to the existence of an implied contract between Republic and him. An implied contract "arises from acts and conduct of parties, it being implied from facts and circumstances that there was a mutual intention to contract." *Haws & Garrett Gen'l Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex.1972). Therefore, Gillum maintains that a course of dealing between the parties can imply a meeting of the minds, *Gray v. Kirkland*, 550 S.W.2d 410, 412 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.), *quoting Haws*, 480 S.W.2d at 609, and the element of mutual agreement is inferred from the circumstances. *Haws*, 480 S.W.2d at 609.

Specifically, Gillum asserts that he and Republic had an implied contract which was evidenced by the course of dealing and conduct between the parties. Gillum states that with his approximate twenty-six year relationship with the hospital, he had contracted with the hospital that he would perform all his surgeries at the hospital,

thereby providing a source of revenue for the hospital, and the hospital in turn contracted to provide medical care to his patients at a level of care greater than or at least equal to the community standard. Gillum contends that although for a majority of the years the contract was honored, in November of 1984, when Republic purchased the hospital, things began to change. Gillum maintains that although Republic orally made representations that it was going to honor the contract between Gillum and Republic and in fact improve the care provided by the hospital, Republic's actions refuted these oral representations.

In response, Republic asserts that prior to moving for summary judgment, the trial court sustained its special exceptions to Gillum's contract claim and ordered him to amend his petition to allege all elements of such a claim. However, because the order sustaining Republic's special exceptions is not before us, we need not address Gillum's failure to replead his cause of action.[6]

For reasons specified in our discussion of Gillum's third point of error concerning an express contract, we overrule Gillum's fourth point of error as to an implied contract.

## PROMISSORY ESTOPPEL

■ In his fifth point of error, Gillum contends that the trial court erred, as a matter of law, in finding that there was no issue of material fact regarding the doctrine of promissory estoppel. Gillum asserts that prior to Republic's acquisition of the hospital in 1984, Republic's representatives had a series of conversations with Gillum and that, in those conversations, Republic's representatives made promises to Gillum regarding the future of the hospital after Republic became the owner. Gillum states that he was told that the hospi-

---

**6.** On January 11, 1989, appellees filed a motion to supplement the transcript with several documents, including the June 2, 1987 order sustaining appellees' special exceptions to Gillum's original petition. On February 6, 1989, appellees were granted leave to file a supplemental transcript within twenty-one days of February 6th. Appellees failed to do so; therefore, the order sustaining appellees' special exceptions is not before this Court. Republic makes the same argument with regard to Gillum's fifth and sixth points of error.

tal's principal objective was to provide a service of outstanding patient care to the Mesquite community. Gillum contends that Van Devender made representations to Gillum that Republic would have sufficient funding to upgrade the hospital's equipment care; that the hospital would remain primarily a "D.O." hospital;[7] that Gillum could continue to make the changes to upgrade the level of health care at the hospital; and that a new hospital facility was to be constructed. Gillum contends that he reasonably relied on those statements made by Van Devender, as well as similar statements made by Buncher and various hospital administrators and staff members, and that based on those assurances, Gillum continued to perform surgeries at the hospital. Further, Gillum asserts that his reliance was foreseeable based upon his twenty-six year association with the hospital and that his reliance on Republic's promises detrimentally affected his reputation and career.

The doctrine of promissory estoppel requires: (1) a promise; (2) the promisor's foreseeability of the promisee's reliance thereon; and (3) substantial reliance by the promisee to his detriment. *English v. Fischer*, 660 S.W.2d 521, 524 (Tex.1983). The doctrine does not create a contract where none existed before, but only prevents a party from insisting upon his strict legal rights when it would be unjust to allow him to enforce them. *Wheeler v. White*, 398 S.W.2d 93, 96 (Tex.1965). Because we have previously concluded that no express or implied contract existed, in that the promises made were too vague and indefinite, we hold that the trial court did not err in granting Republic's summary judgment with regard to Gillum's cause of action for promissory estoppel. Gillum's fifth point of error is overruled.

## ACTUAL AND CONSTRUCTIVE FRAUD

In his sixth point of error, Gillum maintains that the trial court erred, as a matter of law, in finding no issues of material fact regarding actual or constructive

fraud. Gillum asserts that the misrepresentations by Republic consisted of continuous promises to build a new hospital, update the equipment, and improve the quality of patient care. Gillum contends that Republic's misrepresentations, in turn, induced him to continue his association with the hospital; that this association "played havoc" with his reputation, diminished the number of referrals he received, and caused a loss of patient contracts; that those continuing representations were false because in the two-year period that Gillum remained with the hospital, a new hospital was not built, the equipment was not updated, nor was the quality of patient care increased.

Gillum maintains that Republic committed actual fraud because where a misrepresentation is continuing in nature and the influence of a fraud recurring, the injured party may recover for damages occasioned by his continuing inaction in reliance upon the representation, even if at the outset the injured party had no intention of taking action. Although Gillum did not change his position or course of conduct in any way after the misrepresentations, Gillum states that if he had known that Republic was not serious in its representations, he would have changed his course of conduct. Gillum further maintains that Republic's intention at the time the promises were made can be inferred from Republic's conduct.

Asserting that a claim of constructive fraud resulted, Gillum argues that a fiduciary relationship existed between the hospital and him and that Republic breached its equitable duty by repeatedly misrepresenting the standard of care and the status of construction of the new hospital. Gillum reiterates that Republic took advantage of him in a fiduciary relationship where Gillum justifiably relied, to his detriment, on the statements made by Republic, resulting in Gillum suffering considerable damage.

We conclude that the trial court properly entered summary judgment against Gillum on his claim of actual fraud because that

---

**7.** A hospital for doctors of osteopathy.

claim was insufficient as a matter of law. To establish actionable fraud, Gillum must establish that: (1) a material representation was made; (2) the representation was false; (3) at the time the speaker made the representation he knew it was false when made or was reckless about the truth of the matter asserted; (4) the statement was made with the intent that it should be acted upon by the other party; (5) the other party acted in reliance upon it and thereby suffered injury. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex.1983); *First Dallas Petroleum, Inc. v. Hawkins*, 727 S.W.2d 640, 649–50 (Tex.App.—Dallas 1987, no writ).

The burden is on the plaintiff to plead and prove all elements of his fraud claim. *Citizens Standard Life Ins. Co. v. Gilley*, 521 S.W.2d 354, 356 (Tex.Civ.App.—Dallas 1975, no writ). Where, as here, the alleged fraud is based upon a promise to perform in the future, in addition to the above elements, it is necessary to prove facts that the promise was made with a present intent not to perform. *New Process Steel Corp., Inc. v. Steel Corp. of Texas, Inc.*, 703 S.W.2d 209, 214 (Tex App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.). Mere breach of an agreement is not enough in itself to establish that the speaker made the promise with no intention of fulfilling it. *New Process Steel*, 703 S.W.2d at 214; *see William B. Roberts, Inc. v. McDrilling Co., Inc.*, 579 S.W.2d 335, 339–40 (Tex.Civ.App.—Corpus Christi 1979, no writ). Moreover, fraud will never be presumed. *Garcia v. Rutledge*, 649 S.W.2d 307, 312 (Tex.App.—Amarillo 1982, no writ); *William B. Roberts, Inc.*, 579 S.W.2d at 339.

Constructive fraud is the breach of some legal or equitable duty which, regardless of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests. *Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex.1964). Constructive fraud can only occur upon the breach of a legal or equitable duty. *Jackson v. Julian*, 694 S.W.2d 434, 436 (Tex.App.—Dallas 1985, no writ). As previously stated in Gillum's first point of error, we

hold that Republic, as a matter of law, owed no duty to Gillum to provide a certain level of medical care at the hospital. Accordingly, in the absence of such a duty, we hold that summary judgment was properly entered against Gillum. Gillum's sixth point of error is overruled.

### DEFAMATION

In his seventh point of error, Gillum contends that the trial court erred, as a matter of law, in finding that no issue of material fact existed regarding the defamatory statements made by Republic or its representatives. Gillum states that the defamatory statements were made by Steven D. Porter in his capacity as the administrator of the hospital during the relevant period of time. Gillum asserts that in a transmittal letter, Porter informed both the Charter Hospital of Mesquite and the Mesquite Community Hospital, upon inquiry by those hospitals, that Gillum was qualified only for family practice. Gillum believes that as a result of Porter's statement, Gillum was precluded from obtaining surgical privileges at those hospitals.

In support of his argument, Gillum refers to Porter's deposition testimony in which Porter admitted that he could not "evaluate his [Gillum's] performance as a surgeon. I'm [Porter] not trained." Porter also stated during deposition testimony that he did not have "the ability to evaluate his [Gillum's] ability." Gillum also refers to two letters addressed "To Whom It May Concern" in which Porter stated that Gillum "is a capable, conscientious member of our Medical Staff" and that Gillum was afforded "full surgical privileges" at MPH and concluded with "there is nothing to prevent us [Republic] from recommending him for staff privileges at your institution."

Gillum concedes that Porter's statements can, arguably, constitute a qualified privilege. However, Gillum maintains that a qualified privilege is sustained only when the utmost good faith is utilized in making statements of this sort, and Gillum argues that in this instance Porter did not make the statements in good faith since Porter

admits that he did not have the ability to evaluate Gillum's ability as a surgeon. Thus, Gillum asserts that, at the very least, a material issue of fact exists as to whether the statements made by Porter constitute actionable defamation.

The uncontradicted summary judgment evidence established that Republic and its staff, agents, and representatives made no defamatory remarks about Gillum. Republic presented competent summary judgment evidence that it had never made defamatory or derogatory remarks about Gillum. Gillum did not contradict that evidence. Rather, Gillum asserted in his affidavit that "Steven D. Porter has made defamatory remarks about me regarding my ability to practice surgery." Gillum further stated that he was "damaged by Steve Porter's statements that I [Gillum] was qualified only for family practice." [8] Porter was never a party to the lawsuit. No allegation was made, nor was any evidence submitted, attributing the vague statement allegedly made by Porter to Republic. However, assuming Porter's statement was, in fact, attributable to Republic, we, nevertheless, conclude that the trial court properly entered summary judgment against Gillum because Gillum failed to assert a cognizable defamation claim against Republic.

Gillum's claim was based, in part, on statements allegedly made about "other osteopaths." However, one may not maintain an action based upon the harm suffered by another. *Texas Indust. Traffic League v. Railroad Comm.*, 628 S.W.2d 187, 191 (Tex.App.—Austin 1982) *rev'd and remanded on other grounds*, 633 S.W.2d 821 (1982). Thus, Gillum lacked standing to maintain any action on behalf of unnamed osteopathic doctors allegedly defamed by unnamed persons at Republic.

Moreover, the statement allegedly made by Porter was privileged as a matter of law. A privilege will be granted to statements which occur under circumstances wherein any one of several persons having a common interest in a particular subject matter may reasonably believe that facts exist which another, sharing that common interest, is entitled to know. *Seidenstein v. Nat'l Medical Enters., Inc.*, 769 F.2d 1100, 1103 (5th Cir.1985) (applying Texas law). In *Dixon v. Southwestern Bell Tel. Co.*, 607 S.W.2d 240, 242 (Tex. 1980), a qualified privilege was similarly defined as one which:

> [c]omprehends bona fide communications, oral or written, upon any subject in which the author or the public has an interest or with respect to which he has a duty to perform to another owing a corresponding duty. Such privilege is termed conditional or qualified because a person availing himself of it must use it in a lawful manner and for a lawful purpose. The effect of the privilege is to justify the communication when it is made without actual malice.

*Id.* at 242.

Thus, where a statement is privileged, Texas law requires a showing of actual malice to overcome that privilege. *Dixon*, 607 S.W.2d at 242; *Seidenstein*, 769 F.2d at 1104. Actual malice has been defined as "knowledge of falsity or reckless disregard." *Seidenstein*, 769 F.2d at 1104; *see also Foster v. Upchurch*, 624 S.W.2d 564, 566 (Tex.1981); *Dun and Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896, 900 (Tex.1970). Reckless disregard requires proof that a false defamatory statement was made with a high degree of awareness of [its] probable falsity. *Foster*, 624 S.W.2d at 566. Therefore, the burden is on the plaintiff to show that the speaker, in the exercise of a qualified privilege, was motivated by actual malice. *Dixon*, 607 S.W.2d at 242. In fact, there must be sufficient evidence to find that the speaker entertained "serious doubts" as to the truth of his statements. *See St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). Significantly, malice cannot be inferred from the character of the allegedly defamatory

---

**8.** Gillum states in his brief that the alleged statement regarding his ability to practice family medicine was made in a transmittal letter; however, no evidence of the letter is before this Court.

statement without other evidence to prove it. *See Fitzjarrald v. Panhandle Publishing Co.,* 149 Tex. 87, 96, 228 S.W.2d 499, 505 (1950).

In this case, the only defamatory remark referenced by Gillum was Porter's statement that Gillum was qualified for "family practice." That statement was made in response to a request by a local hospital for Porter's evaluation of Gillum's credentials and qualifications. The summary judgment evidence showed that Porter made his recommendation based upon his knowledge that: (1) the inquiring hospitals required their surgeons to have completed a formal, certified residency in surgery; and (2) Gillum had never performed such a residency.

We conclude that Porter's statement regarding Gillum's qualifications was clearly privileged. Both Porter and the inquiring hospitals shared a common interest in Gillum's qualifications, and Porter reasonably believed that the hospitals were entitled to a recommendation based upon the facts known to him. In *Seidenstein,* a case very similar to the case at bar, the court held that statements made to a group of physicians regarding the suspension of a physician's staff privileges were protected by the qualified privilege accorded under Texas law. *Seidenstein,* 769 F.2d at 1103. Furthermore, Gillum's contention that Porter's statement that he could not evaluate Gillum's ability as a surgeon was somehow an admission of his malicious intent is without merit. Porter's honest admission that he could not evaluate Gillum's ability as a surgeon certainly did not affect Porter's ability to state Gillum's background and credentials. Accordingly, because the only alleged defamatory statement made about Gillum was privileged as a matter of law, the trial court properly entered summary judgment against Gillum on his defamation claim. We overrule Gillum's seventh point of error and affirm the judgment of the trial court.

WHITHAM, J., concurs.

WHITHAM, Justice, concurring.

I concur in the result. While I do not address each of my concerns with the majority opinion, I must specify my disagreement with the majority's disposition of the issue of whether Gillum is foreclosed from contesting the judgment as to all of the appellees. To the extent that the majority's opinion can be read to mean that a judgment "approved as to form and substance" renders the judgment a consent or agreed judgment, I disagree. I am unwilling to read "approved as to form and substance" as the equivalent of "agreed to and approved." Instead, to my mind, "approved as to form and substance" is virtually the same as "approved as to form" or "approved as to form only." Thus, in my view, "approved as to substance" means nothing more than that Gillum approved the language used in the document as expressing the correct recapitulation of the matter being disposed of by the trial court's final judgment. We must be careful that notations on judgments such as in the present case, placed there as a courtesy to bench and bar, not be read to stipulate away any losing party's position on appeal. *See Guaranty Federal Savings & Loan Ass'n v. Horseshoe Operating Co.,* 748 S.W.2d 519, 530 (Tex.App.—Dallas 1988, writ pending).